J-A18009-18

2018 PA Super 345

| IN RE: INSURANCE TRUST AGREEMENT OF FRANK P. SAWDERS, JR. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF COMMONWEALTH OF PENNSYLVANIA | No. 2678 EDA 2017 |

Appeal from the Order Entered July 25, 2017
In the Court of Common Pleas of Montgomery County
Orphans' Court at: No 2017-X1560

| IN RE: INSURANCE TRUST AGREEMENT OF FRANK P. SAWDERS, JR. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF CHILDREN'S HOSPITAL OF PHILADELPHIA | No. 2832 EDA 2017 |

Appeal from the Order Entered July 25, 2017
In the Court of Common Pleas of Montgomery County
Orphans' Court at: No 2017-X1560

BEFORE:  STABILE, J., STEVENS, P.J.E.,* and STRASSBURGER, J.**

OPINION BY STABILE, J.:                    **FILED DECEMBER 18, 2018**

---

* Former Justice specially assigned to the Superior Court.

** Retired Senior Judge assigned to the Superior Court.

In these consolidated appeals, the Commonwealth of Pennsylvania and Children's Hospital of Philadelphia ("Appellants") appeal from an order providing that the two grandchildren ("Grandchildren") of Frank P. Sawders, Jr., settlor of an Insurance Trust Agreement ("Trust") executed over fifty years ago, are entitled to share 100 percent of Trust income for life. Appellants argue that the Trust limits Grandchildren's share to 60 percent of Trust income and that the remaining 40 percent goes to seven charities. Appellants also appeal the Orphans' Court's award of counsel fees to one of the grandchildren, Stephanie Laisy.

We affirm the portion of the Orphans' Court's order that Grandchildren receive 100 percent of Trust income for life. When one grandchild dies, the charities will become entitled to receive 50 percent of Trust income. When the second grandchild dies, the charities will become entitled to receive 100 percent of Trust income. We reverse the portion of the Orphans' Court order awarding counsel fees to Stephanie Laisy.

Settlor, Frank P. Sawders, Jr. ("Settlor"), created the Trust on April 7, 1966 and amended it on September 12, 1966 and May 31, 1967. The Girard Trust Bank was named as Trustee. The Trust's purpose was "to create an Insurance Trust of the proceeds of certain life insurance policies now in effect on [Settlor's] life." The Trustee's role was to hold the policies as "custodian" during Settlor's life and to carry out the other terms and conditions of the Trust during and after Settlor's life.

Settlor died on October 4, 1967, making the Trust irrevocable. Following a series of mergers and acquisitions, BNY Mellon, N.A., became the current Trustee as successor in interest to Girard Trust Bank.

Article V of the Trust provides that following Settlor's death:

Trustee shall hold the principal of the Trust in the TRUST Estate in trust nevertheless and shall pay the net income[1] quarterly or at other convenient intervals, but not less frequently than annually, to or for the benefit of EMILY SAWDERS LAISY, daughter of said SETTLOR during her life, and to the extent income is not sufficient, the TRUSTEE shall invade principal to pay medical expenses incident to a prolonged illness of EMILY SAWDERS LAISY, her children or her husband but only to the extent that such medical expenses are not covered by hospitalization or medical insurance.

Article VI of the Trust provides:

Upon the death of EMILY SAWDERS LAISY, the daughter of said SETTLOR, or upon the death of the SETTLOR in the event that his daughter is not then living, the income of the Trust Estate shall be paid as follows:

1. Ten (10%) percent thereof to MARGARET SAWDERS, sister of the SETTLOR, for the term of her life; and

2. Ten (10%) percent thereof to RUTH SAWDERS, sister of the SETTLOR, for the term of her life; and

3. Ten (10%) percent thereof to MARY SAWDERS, sister of the SETTLOR, for the term of her life; and

4. Ten (10%) percent thereof to LEO SAWDERS, brother of the SETTLOR, for the term of his life; and

---

[1] The Trust and its amendments use "net income" and "income" interchangeably. For purposes of this decision, we deem these terms to have identical meanings.

5. Ten (10%) percent thereof to MRS. GEDA WALLACE, 200 W. 58 St., New York, New York;[2] and

6. **The balance of income shall be divided into as many shares as there shall be children then living of SETTLOR'S daughter, EMILY SAWDERS LAISY,** and the TRUSTEE shall pay the said income equally to or for the benefit of such children for the term of each child's life. Until age 21 such payments of income shall be made to the guardian of the person having custody of the child and thereafter shall be made directly to the child.

[Emphasis added].

Article VIII of the Trust provides:

Upon the death of any of the income beneficiaries set forth in Article VI, the interest of said beneficiary shall lapse and the share of principal **of which such income was previously paid** shall be held in further Trust by my TRUSTEE, such Trust to be known as "Mary M. and Frank P. Sawders, Jr. Charitable Trust" and the net income shall be paid as follows:

1. Twenty (20%) percent thereof to the MERCY HOSPITAL, Pittsburgh, Pennsylvania.

2. Forty (40%) percent thereof to the HOSPITAL OF UNIVERSITY OF PENNSYLVANIA, Philadelphia, Pennsylvania.

3. Ten (10%) percent thereof to the CHILDREN'S HOSPITAL, Pittsburgh, Pennsylvania.

4. Ten (10%) percent thereof to the ST. PAUL'S ROMAN CATHOLIC ORPHANAGE, Pittsburgh, Pennsylvania.

5. Ten (10%) percent thereof to the CHILDREN'S HOSPITAL, Philadelphia, Pennsylvania.

6. Ten (10%) percent thereof to the CHURCH FARM SCHOOL, Paoli, Pennsylvania.

---

[2] On September 12, 1966, Settlor amended Article VI of the Trust to revoke Geda Wallace's share.

[Emphasis added].

On May 31, 1967, Settlor amended the Trust as follows:

The Trustees shall keep any property added to this trust during my lifetime invested, with all powers, authorities, and discretion given in the original DEED, and shall distribute net income and principal as follows:

A. As much—even if all—of the net income and principal as I may from time to time direct in writing shall be paid either to me or as I may specify;

B. As much of the net income and principal as the Trustee may from time to time think desirable for my welfare, comfort or support or for the **welfare, comfort, support or education of my daughter EMILY SAWDERS LAISY, or any of her children** either shall be paid to me or to that person or shall be applied directly for those purposes; and

C. Any remaining net income shall from time to time be accumulated and added to the principal.

I expressly direct that the Trustee may, under Paragraph B, make such payments to or for the benefit of my daughter **and her children** as the Trustee believes I would have made personally, even without a specific authorization from me, but the Trustee shall promptly advise me of such payment.[3]

[Emphasis added].

Following Settlor's death, Settlor's daughter, Emily Sawders Laisy ("Daughter"), received 100 percent of Trust income for 49 years until her own death on May 28, 2016. Settlor designated his four siblings and Daughter's

---

[3] In addition, on May 31, 1967, Settlor amended the charitable trust in Article VIII to reduce the share of the Hospital of the University of Pennsylvania from 40 percent to 20 percent and to bequeath 20 percent to Johns Hopkins Hospital in Baltimore, Maryland.

children as beneficiaries in the event of Daughter's death. Daughter was survived by two children, Stephanie A. Laisy and Christopher Laisy (collectively "Grandchildren" or individually "Granddaughter" or "Grandson"). Settlor's four siblings predeceased Daughter.

Settlor also provided for the Trust to fund the Mary M. and Frank P. Sawders, Jr. Charitable Trust ("Charitable Trust") and designated seven charities as income beneficiaries. To date, the Charitable Trust is unfunded.

In January 2017, seven months after Daughter's death, Trustee informed Granddaughter that it would seek "guidance" from the Montgomery County Orphans' Court regarding whether Grandchildren should share 100 percent or 60 percent of Trust income. As of January 31, 2017, the value of the Trust totaled $3,774,026.64.

Instead of seeking guidance, Trustee distributed $10,000 to Grandson conditioned upon his execution of a "Refund Agreement" in which he agreed to refund the Trust if required. Granddaughter declined a similar offer from Trustee.

On April 24, 2017, Granddaughter filed a petition for judicial intervention and declaratory judgment pursuant to 20 Pa.C.S.A. § 7711, requesting the Orphans' Court to determine that Grandchildren are 100 percent income beneficiaries and award Granddaughter reasonable counsel fees to be paid from the Trust for Trustee's failure to seek guidance from the court on its own. The seven charities and the Commonwealth, acting as *parens patriae*, opposed

the petition, claiming that Grandchildren should share 60 percent of Trust income, while the remaining 40 percent of Trust income and principal should immediately fund the Charitable Trust.

On July 25, 2017, the Orphans' Court granted Granddaughter's petition and ordered that Grandchildren were 100 percent income beneficiaries of the Trust. The Orphans' Court also ordered the Trustee to pay Granddaughter attorney fees not to exceed $7,500.00 from Trust assets. Appellants filed timely appeals to this Court, and both Appellants and the Orphans' Court complied with Pa.R.A.P. 1925.

Appellants raise two questions in these appeals:

I. Are [S]ettlor's two [G]randchildren legally entitled to share 100% (rather than 60%) of the current income from [the Trust] for life, given the inherent tension between Article VI and Article VIII of the [T]rust instrument as written and given [S]ettlor's explicit intention to benefit certain Pennsylvania charities?

II. Is there any legal basis for the unexplained award—in favor of [G]randchildren—of "up to $7,500.00" in attorney fees, payable from Trust assets?

Commonwealth's Brief at 5.[4]

The first and most important question in this appeal is whether, in the wake of Daughter's death, Grandchildren are entitled to receive 100 percent

_____

[4] The Commonwealth filed a brief in support of its appeal at 2678 EDA 2017. Children's Hospital of Philadelphia filed a brief joining in the Commonwealth's brief in its entirety.

- 7 -

of Trust income, or whether Grandchildren and the charities are entitled to 60 and 40 percent, respectively.

Preliminarily, we observe that the Commonwealth, acting through its Attorney General as *parens patriae*, has standing to participate in this case. The Commonwealth is "an indispensable party in every proceeding which affects a charitable trust[.]" *In re Voegtly's Estate*, 151 A.2d 593, 594 (Pa. 1959); *see also* 71 P.S. § 732-204(c) (Attorney General authorized to intervene in any action "involving charitable bequests and trusts"). Settlor identified seven charities as beneficiaries of Trust income. Since these charities have an interest in Trust assets, the Attorney General is an indispensable party to this litigation. Beyond that, the Attorney General "represents a broader interest than that of [any] charity alone. He must protect the interests of the public at large, to whom the social and economic benefits of [charitable] trusts accrue." *In re Estate of Feinstein*, 527 A.2d 1034, 1036 n.3 (Pa. Super. 1987).

The Uniform Trust Code provides that "the court may intervene in the administration of a trust to the extent its jurisdiction is invoked by an interested person or as provided by law." 20 Pa.C.S.A. § 7711(a). Granddaughter, an interested person, triggered the Orphans' Court's jurisdiction by filing a petition seeking judicial intervention and declaratory judgment under Section 7711(a). The Orphans' Court enjoyed jurisdiction to construe the Trust under 20 Pa.C.S.A. § 7711(c), which states: "A judicial

proceeding involving a trust may relate to any matter involving the trust's administration, including a request for declaratory judgment." *Id.*; *see also* 42 Pa.C.S.A. § 7533 (Declaratory Judgment Act authorizes court to construe "instruments" such as trusts).

"In interpreting a trust instrument, the intent of the settlor is paramount and if that intent is not contrary to law, it must prevail." *Estate of Taylor*, 522 A.2d 641, 642 (Pa. Super. 1987). The settlor's intent is to be determined from all the language within the four corners of the trust instrument, the scheme of distribution, and the circumstances surrounding the execution of the instrument. *Id.* at 643. "Only when the language of the trust is ambiguous or conflicting or when the settlor's intent cannot be garnered from the trust language do the tenets of trust construction become applicable." *Estate of Loucks*, 148 A.3d 780, 782 (Pa. Super. 2016) (denying charitable beneficiary's request to invade principal because plain language of trust did not permit discretionary distributions from principal). However great the temptation is to supply terms in accordance with what the settlor presumably would have provided had the omission been called to his attention, the court is without power to reform an unambiguous instrument. *Trust under Gift of Clark*, 856 A.2d 1201, 1204 (Pa. Super. 2004).

The Orphans' Court explained that the plain language of the Trust made the Grandchildren 100 percent income beneficiaries:

> [Settlor] directed that [Daughter] receive the income from this Trust for the duration of her life. Following her death, which

occurred in 2016, income [was] to be paid to [Settlor's] siblings in certain percentages, for the term of their life. None of Settlor's siblings survived [Daughter]. The balance of the income under Article VI is to be shared between the children of [Daughter], of which there are two. This court notes that the Settlor used the term 'balance' rather than stating a set percentage to be shared among his grandchildren. Thus, it is Article VI of the Trust that determines the current income beneficiaries of the Insurance Agreement Trust. As [Settlor's] grandchildren are the only surviving income beneficiaries, they are the current income beneficiaries of the [Trust].

The court must next address the amount of income to which they are entitled to share. [Granddaughter] argues that the grandchildren are entitled to share 100% of the income of the [Trust] and this court agrees. The reasoning becomes clearer upon reading Article VIII of the Trust.

Article VIII of the Trust dictates when the Charitable Trust is to be funded. Settlor specifically states that upon the death of any of the income beneficiaries set forth in Article VI, the interest of said beneficiary shall lapse and the share of principal of which such income was previously paid shall be held in the Charitable Trust and income paid in the set percentages to the specific charities named by Settlor. This court found the phrase "the share of principal of which such income was previously paid shall be held in further Trust" manifested [Settlor's] intent. When reading the Deed of Trust and its Amendments as a whole, it is clear to this court, based upon the unambiguous language used by Settlor, that the Charitable Trust is to be funded with the share of principal from which such income "was previously paid" to the persons identified in Article VI. Since no income was ever paid to Settlor's siblings, there is no principal with which to fund the charitable trust at this time.

Orphans' Ct. Op., 11/28/17, at 4-5 (some capitalization omitted).

We agree with this analysis. Under the original Trust, the Charitable Trust's right to Trust principal does not vest until the death of any person named in Article VI who survives Settlor and Daughter. Since this event has

- 10 -

not yet taken place, the Charitable Trust's right to funding has not vested, so there is presently no income to pay to the charities.

To elaborate, under Article VI, any of Settlor's four siblings who survive Daughter would receive 10 percent of Trust income until death. At death, the Charitable Trust would receive 10 percent of Trust principal, the "share of principal of which such income **was previously paid**" to the sibling, and the Charitable Trust would pay each charity the percentage of Trust income prescribed in Article VIII. Any sibling who died before Daughter would not receive Trust income during his or her lifetime. At death, that sibling's share would be divided equally among Daughter's surviving children, and the Charitable Trust would receive nothing, because no income "was previously paid" to the sibling during his or her life.

Here, all of Settlor's siblings died before Daughter. Thus, under Article VI, each of their 10 percent shares went to the Grandchildren, leaving the Grandchildren with 100 percent of Trust income to divide equally. The Charitable Trust's right to principal has not vested and will not vest until one of the Grandchildren dies.

Further, under Article VI, 60 percent of Trust income shall be divided equally among Daughter's surviving children (the Grandchildren).[5] Upon the death of any Grandchild, the Charitable Trust shall be funded with "the share

---

[5] Again, because each of Settlor's siblings predeceased Daughter, the Grandchildren's share increased from the original 60 percent to 100 percent.

- 11 -

of principal of which such income **was previously paid**" to the child. Here, two Grandchildren survived Daughter, and both remain alive, so the Charitable Trust's right to principal has not vested.

The May 31, 1967 amendment to the Trust did not change the charities' position. The amendment (1) authorizes Settlor to invade principal and income for any reason during his lifetime; (2) gives the Trustee the discretion to add Trust income to principal and to invade Trust principal for Daughter's and the Grandchildren's welfare, comfort, support or education; and (3) permits the Trustee to add income to principal from time to time. These revisions expand Settlor's and the Trustee's powers, but they do not accelerate the Charitable Trust's funding rights. As in the original Trust, the Charitable Trust's right does not vest until the death of any person named in Article VI who survived Settlor and Daughter—here, one of the Grandchildren. Because both Grandchildren remain alive today, the Charitable Trust's right remains unvested.

> The Attorney General insists that the charities
>
> became entitled to a 10% interest in the income of the Trust upon the death of each of [Settlor's] four named siblings (a total of 40% once all four siblings had died), although the charities' enjoyment of those income shares was postponed until after the death of [Daughter]. This is so because the charities' income shares were vested upon creation; they were not, as [Granddaughter] has implicitly suggested, mere contingent remainders, depending for their effectiveness upon [Settlor's] siblings' surviving [Daughter].

.   .   .

- 12 -

> Here, the Trust does not contain any written requirement that any of the named beneficiaries survive [Daughter]. Absent such a stipulation, the charities' respective income interests became vested when [Settlor] himself died, regardless of how long any other income beneficiary might or might not live . . . If [Settlor] wanted to ensure that no Trust income could or would be paid to the listed charities until after he, [Daughter], his siblings, and his grandchildren were all dead, he could easily have said so.

Commonwealth's Brief at 22, 23. The plain language of the Trust does not support this "postponement" theory. As discussed above, the Charitable Trust's right to principal does not vest upon the death of Settlor or Daughter, but upon the death of one of the Grandchildren, an event that has not taken place.

The Attorney General also argues that "previously paid" is "unclear at best," because "[w]hile the suggestion that trust income must have 'previously' been paid to some beneficiaries invites interpretation, that verbiage—standing alone—does not mandate divestiture or extended postponement of the charities' income interest until the deaths of both [Grandchildren]." We disagree. We have no trouble concluding that "previously paid," read in context, means that the income beneficiary survived both Settlor and Daughter, was paid Trust income, and then died himself or herself. The Grandchildren survived Settlor and Daughter and have been paid Trust income, but they both remain alive. Until one of them dies, the Charitable Trust cannot be funded, and the charities cannot receive Trust income.

For these reasons, we hold that the Orphans' Court properly ordered the Trust to pay 100 percent of Trust income to the Grandchildren. Upon the death of one of the Grandchildren, the Charitable Trust's right of funding will vest, and it will receive 50 percent of Trust principal and pay the charities 50 percent of Trust income in accordance with Article VIII. When the second grandchild dies, the Charitable Trust will receive the remaining 50 percent of Trust principal and pay the charities 100 percent of Trust income in accordance with Article VIII.

In their second issue, Appellants challenge the Orphans' Court's decision to award Granddaughter up to $7,500.00 in attorney fees from Trust assets. We agree with Appellants that this decision was an abuse of the Orphans' Court's discretion.

We review awards of attorney fees for palpable abuse of discretion. **In re Barnes Foundation**, 74 A.3d 129, 135-36 (Pa. Super. 2013). The Orphans' Court's opinion did not explain its basis for awarding counsel fees. Nor is any basis apparent from the record. "The general rule is that each party to adversary litigation is required to pay his or her own counsel fees." **Estate of Wanamaker**, 460 A.2d 177, 179 (Pa. Super. 1983). The Judicial Code permits an award of reasonable counsel fees "as a sanction against another participant for dilatory, obdurate or vexatious conduct during the pendency of a matter." 42 Pa.C.S.A. § 2503(7). There was nothing dilatory, obdurate or vexatious about the Trustee's conduct herein. This case required careful

construction of intricate Trust documents. The Trustee opposed Granddaughter's interpretation of these documents and posited an alternative, albeit unmeritorious, interpretation of its own. The fact that Granddaughter's interpretation prevailed is not sufficient reason for awarding her counsel fees. Moreover, the Judicial Code authorizes an award of counsel fees where "the conduct of another party in commencing the matter or otherwise was arbitrary, vexatious or in bad faith." 42 Pa.C.S.A. § 2503(9). This provision does not apply because Granddaughter commenced this case, not the Trustee. Under the plain language of Section 2503(9), a party cannot be sanctioned for defending itself.

In the absence of a statute allowing counsel fees, "recovery of such fees will be permitted only in exceptional circumstances . . . [such as] where the work of counsel has created a fund for the benefit of many." **Estate of Wanamaker**, 460 A.2d 824, 825 (Pa. Super. 1983). Although Granddaughter's position is meritorious, she did not create a fund for the benefit of many; to the contrary, she succeeded in preventing the charities' access to Trust income for the foreseeable future.

Accordingly, we reverse the portion of the Orphans' Court order awarding counsel fees to Granddaughter.

Order affirmed in part and reversed in part in accordance with this Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/18/18</u>